# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**ALVIN ROSCOE BENNETT,**
**Plaintiff,**

*vs.*

**Civil Action No. 5:14cv100**
**(The Honorable Frederick P. Stamp, Jr.)**

**COMMISSIONER OF SOCIAL SECURITY,**
**Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Alvin Roscoe Bennett ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security

("Defendant" and sometimes "Commissioner") denying his claims for Supplemental Security Income

("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social

Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross

motions for summary judgment and has been referred to the undersigned United States Magistrate

Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. §

636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. Procedural History

Plaintiff previously filed applications for SSI and DIB on April 18, 2009; on May 27, 2011,

Administrative Law Judge ("ALJ") Carol Baumerich entered a decision finding that Plaintiff had not

been under a disability from October 25, 2006 through the date of her decision (R. 47-54). Plaintiff

filed another application for SSI on July 27, 2011, and another application for DIB on July 20, 2011,

alleging disability since May 28, 2011, due to seizures, left knee injury, arthritis, and back and neck

injury (R. 145-59, 168, 185). The state agency denied Plaintiff's applications initially and on

reconsideration (R. 66-75, 77-90). Plaintiff requested a hearing, which ALJ Brian P. Kilbane held

on January 10, 2013, and at which Plaintiff, represented by counsel, Britt Clark, and James Ganoe, a vocational expert ("VE") testified (R. 25-43.). On January 25, 2013, the ALJ entered a decision finding Plaintiff was not disabled (R. 11-20). Plaintiff timely filed a request for review of the ALJ's decision with the Appeals Council (R. 7). On May 30, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-5).

## II. Statement of Facts

Plaintiff was born on October 30, 1965, and was forty-seven (47) years old at the time of the administrative hearing (R. 28, 145, 149). He obtained his GED in 1993 and has past relevant work as a truck driver and construction worker (R. 186).

On December 19, 2007, Plaintiff was admitted to Pocahontas Memorial Hospital after falling off a cliff and being exposed to the cold (R. 334-37). An X-ray of his left lower leg showed a fracture at his lateral tibial plateau (R. 357). Plaintiff was transferred to Ruby Memorial Hospital that same day (R. 369). Another X-ray confirmed a "nondepressed fracture of the lateral tibial condyle" in Plaintiff's left knee. There was also "a lucency in the mid section of the neck of the fibula, which may represent a fracture." Dr. Frick also noted a "large knee joint effusion" (R. 301). Plaintiff was diagnosed with status post fall, left tibial plateau fracture, and left knee lacerations. He was prescribed Percocet, Aspirin, and Senokot and was discharged home on December 20, 2007 (R. 276).

Plaintiff underwent an X-ray of his left knee on January 10, 2008. Dr. Nguyen noted a "vertical fracture through the lateral tibial condyle . . . without significant articular depression." However, the X-ray also revealed evidence that the fracture was healing. Dr. Nguyen also noted a "large knee joint effusion" (R. 312).

2

On March 20, 2009, Plaintiff established care with Dr. V. Waid McMillion. He complained of significant back and neck pain with mild dizzy spells. His dizziness had began about three (3) years ago after "an onset of new seizure disorder." Plaintiff had not had any seizures "in over two years." Plaintiff had "atypical" work as a carpenter and was also a truck driver. Upon examination, Dr. McMillion noted difficulty with range of motion and osteoarthritis. An X-ray showed arthritis with no disk space loss. Plaintiff had "significant degenerative arthritis in his left knee." Dr. McMillion assessed lower back pain, left knee pain, and dizziness, questionable seizure disorder. He injected Plaintiff's left knee with Kenalog, Lidocaine, and Marcaine, and prescribed Naprosyn and Flexeril (R. 321).

Plaintiff returned to see Dr. McMillion on April 17, 2009. He had not had any significant seizure spells since his last visit; however, he complained of chronic dizziness and lower back pain. Working on his mother's home and floors had increased his back pain. Dr. McMillion noted that Plaintiff was able to ambulate into the clinic without significant problems. Upon examination, Dr. McMillion noted that Plaintiff had palpable tenderness "along the lumbosacral area with mildly increased tissue texture changes." He assessed seizure disorder by history and lower back pain, arthritic in nature. Dr. McMillion prescribed Naprosyn, Flexeril, Tramadol, and Topamax, and advised Plaintiff to return in three (3) months (R. 320).

On July 19, 2009, Plaintiff saw Dr. McMillion for a followup. He continued to experience bilateral knee pain and dizzy spells. Upon examination, Dr. McMillion noted bilateral DJD. He assessed bilateral knee pain and subjective dizziness. Dr. McMillion injected Plaintiff's left knee (R. 319).

Plaintiff saw PA Erica Adkins on November 2, 2009, for pain. He had not been able to

3

receive joint injections in his knees and shoulders because his appointments with Dr. McMillion had been canceled and rescheduled. Plaintiff needed "something to get him through." His pain was a six (6) or seven (7). PA Adkins assessed generalized arthritic pain, injected Plaintiff with Toradol and Kenalog, and advised him to continue taking his medications (R. 319).

On November 12, 2009, Plaintiff saw Dr. McMillion for a followup. Plaintiff had experienced no seizures since his last visit, and his dizziness had "greatly improved" since starting new medication. Plaintiff was not having "any significant problems." With the change in weather, he had become "increasingly more arthritic." Plaintiff had brought a functional capacity examination form for Dr. McMillion to complete; Dr. McMillion told Plaintiff that he did not complete such forms. Dr. McMillion noted a normal examination and assessed psychogenic seizure disorder and subjective dizziness with no objective findings. He stated that there was "no reason why [Plaintiff] should not be able to perform daily duties of the labor given his age" (R. 318).

Plaintiff saw Dr. Sophia Sibold for a checkup on January 25, 2010. He had been "doing well" on Tegretol for his seizures. Plaintiff had experienced some dizzy spells; increasing his Tegretol to three (3) times per day helped with those symptoms. He took Naprosyn, Flexeril, and Ultram for bilateral severe arthritic pain. Upon examination, Dr. Sibold noted that Plantiff's right shoulder had pain with external rotation. She assessed epilepsy, right shoulder pain, DJD, arthritis, and knee pain. She injected Plaintiff's right knee and right shoulder with Dexamethason, Xylocaine, and Marcaine, and continued Plaintiff on his medications (R. 317).

On April 19, 2010, Plaintiff saw Dr. Sibold for a checkup for his epilepsy. He still had severe arthritis but had not experienced any seizure. Upon examination, Dr. Sibold noted that Plaintiff had some "joint pains and arthritis in his right shoulder and his right knee." She assessed

4

epilepsy and right shoulder, knee, and joint pain. Dr. Sibold continued Plaintiff's medications and advised him to follow up in six (6) months (R. 316).

Plaintiff saw Dr. Sibold again on October 4, 2010, for lower back pain. He had experienced a "dizzy episode." Plaintiff's shoulder pain was "doing little bit better." Dr. Sibold noted a normal examination and assessed epilepsy, seizure disorder, dizziness, lower back pain, and shoulder pain. She advised Plaintiff to follow up in three (3) months (R. 316).

On January 3, 2011, Plaintiff saw Dr. Sibold for a follow up. He had experienced one seizure; he was taking Tegretol three (3) times per day. Plaintiff had experienced dizzy spells; he could feel them "coming along." Sitting helped them to go away. Plaintiff took Ultram and Flexeril for his knee and joint pains; those medications helped to keep "things controlled." Dr. Sibold noted a normal examination and assessed seizure disorder, epilepsy, DJD, chronic pain, and dizziness. She continued Plaintiff's medications and advised him to follow up in three (3) to four (4) months. She also stated that she would try to refer Plaintiff to a neurologist for his dizziness (R. 315).

Plaintiff returned to Dr. Sibold on April 25, 2011 for a recheck. He had not been experiencing dizzy spells since increasing his seizure medication. Plaintiff was still experiencing "significant arthritis;" he took Ultram, Naprosyn, and Flexeril to help. Ultram had not made his seizures worse, and Plaintiff stated that he wanted to remain on it because it helped with his pain. Plaintiff was "doing well" on his medications; they "sedate[d] him a little bit." Dr. Sibold noted a normal examination and assessed seizure disorder, epilepsy, and DJD. She continued Plaintiff's current medications and advised him to follow up in four (4) months (R. 314).

On July 20, 2011, Plaintiff saw Dr. Betsy Bartlett, a chiropractor, for his neck and lower back pain. He rated his lower back pain as a ten (10) on a ten (10)-point scale. Dr. Bartlett conducted an

examination and noted several posterior displacements and subluxations of Plaintiff's spine. She administered an adjustment to his full spine to "improve vertebral alignment and increase mobility" (R. 248).

On July 25, 2011, Plaintiff saw Dr. Sibold for his seizure disorder. He reported that he had not been experiencing seizures. Plaintiff was taking Tegretol, Dilantin, Ultram, Naprosyn, and a muscle relaxer. He took those medications to control his seizures and arthritis. Dr. Sibold noted a normal examination and assessed DJD and seizure disorder. She refilled Plaintiff's prescriptions and advised him to follow up in three (3) months (R. 240).

Plaintiff returned to see Dr. Bartlett on July 27, 2011. He stated that there had not "been any significant improvement in the left and right neck pain." Plaintiff complained of a "persistent degree of pain bilaterally in the thoracic area." He also had experienced "no change in the degree of pain in the left and right lower back." Upon examination of Plaintiff, Dr. Bartlett noted several posterior displacements, rotations, and subluxations of Plaintiff's spine. She administered an "adjustment to the full spinal region, in order to increase functional mobility and correct segmental misalignment." She instructed Plaintiff to return once a week "until modified by reexamination" (R. 248).

On August 3, 2011, Plaintiff told Dr. Bartlett that he had not experienced "significant improvement in the left and right neck pain." His pain in the left and right lumbar region "remained the same," and he had a "persistent degree of pain bilaterally in the thoracic area." Upon examination, Dr. Bartlett noted several posterior rotations, subluxations, and displacements of various areas of Plaintiff's spine. She administered a chiropractic adjustment to his full spine to "correct subluxation of the vertebral segments" (R. 248-49).

Plaintiff returned to see Dr. Bartlett on August 10, 2011. His pain was the same as it had been at his previous visit. Upon examination, Dr. Bartlett noted several posterior rotations,

subluxations, and displacements of various areas of Plaintiff's spine. She administered an adjustment to his full spine to "correct subluxation and reduce vertebral fixation" (R. 249).

Plaintiff completed a Function Report–Adult on August 15, 2011. On a typical day, Plaintiff woke early, drank a cup of coffee while watching television, took a nap, ate lunch, and watched television again. He took care of his grandson during summers, and helped water and feed pets. Plaintiff's conditions affected his sleep because he found it "hard to get comfortable." He had no problems with personal care (R. 172). Plaintiff could prepare his own meals; he often prepared sandwiches, cereal, and microwave dinners. He usually only prepared lunch because his wife prepared other meals. As for housework, Plaintiff loaded and unloaded the dishwasher and did some laundry (R. 173.) He tried to mow the grass with a push mower, but afterwards he could hardly walk for three (3) days because of severe back pain. Plaintiff went outside about once a day. He could walk, drive a car, and ride in a car. He could pay bills, count change, handle a savings account, and use a checkbook and money orders (R. 174). Plaintiff used to enjoy fishing, hunting, and camping; he could not do those activities anymore. He visited family once a month and went to his doctor every three (3) months. He did not like to drive; his wife usually drove him (R. 175). Plaintiff could walk about 100 yards before needing to rest; he did not take "long walks" (R. 176).

On August 19, 2011, Plaintiff returned to see Dr. Bartlett. He had not experienced any relief of his neck and lower back pain. Upon examination, Dr. Bartlett noted several posterior rotations, subluxations, and displacements of various areas of Plaintiff's spine. She adjusted Plaintiff's full spinal region "to correct misalignment and relieve joint fixation" (R. 249).

Plaintiff returned to see Dr. Bartlett on August 31, 2011. His pain remained the same. Upon examination, Dr. Bartlett noted several posterior rotations, subluxations, and displacements of

various areas of Plaintiff's spine. She recommended an adjustment to "correct spinal misalignment in the full spine" (R. 250).

On September 14, 2011, Plaintiff told Dr. Bartlett that there had not been "any significant improvement in the left and right neck pain." He continued to experience "a persistent degree of pain bilaterally in the thoracic area." Furthermore, "his pain and discomfort in the left and right lumbar region ha[d] continued unabated." Upon examination, Dr. Bartlett noted several posterior rotations, subluxations, and displacements of various areas of Plaintiff's spine. Dr. Bartlett adjusted Plaintiff's full spine to "reduce fixation subluxation and increase mobility" (R. 250).

Dr. Bartlett completed a Routine Abstract Form–Physical for Plaintiff on October 5, 2011. She diagnosed Plaintiff with chronic lower back and leg pain, pain in the thoracic area, and severe left knee pain. Dr. Bartlett opined that Plaintiff could not do any lifting because of these conditions. He could climb ramps, but "every else cause[d] exacerbation of back and knee pain." Plaintiff was compliant with treatment; he appeared for scheduled appointments (R. 244). Dr. Bartlett found that Plaintiff had a weak grip with both hands, and that he had trouble bending to put on shoes. He could only rotate his shoulders to forty-five (45) degrees before experiencing pain. Plaintiff was only able to bend his lower back to thirty (30) degrees before experiencing pain. He was unable to lift his legs at all without pain. Plaintiff could not bend his left knee, and his left knee was painful when standing and walking. Dr. Bartlett noted that Plaintiff experienced daily headaches and became disoriented (R. 245).

Dr. Atiya Lateef completed a Physical Residual Functional Capacity Assessment of Plaintiff on October 25, 2011. She determined that Plaintiff could occasionally lift and carry twenty (20) pounds; frequently lift and carry ten (10) pounds; stand, walk, and sit for about six (6) hours in an

eight (8)-hour workday; and was unlimited in pushing and pulling (R. 252). Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; he could never climb ladders, ropes, and scaffolds (R. 253). He needed to avoid concentrated exposure to extreme cold and vibration and all exposure to hazards (R. 255). Dr. Lateef opined that Plaintiff could perform light work that avoided heights and hazards (R. 258).

Plaintiff returned to see Dr. Sibold on November 28, 2011, for a checkup. He had not "had a seizure in a while" and had "been doing stable." Plaintiff reported that his arthritis had been bothering him and that Naprosyn was "not helping a whole lot anymore." Dr. Sibold noted a normal examination and assessed seizure disorder and arthritis. She refilled Plaintiff's prescriptions, switched him from Naprosyn to Lodine, and advised him to follow up in four (4) to six (6) months (R. 259, 264).

On December 9, 2011, Dr. Fulvio Franyutti reviewed Dr. Lateef's October 25, 2011, Physical Residual Functional Capacity Assessment and affirmed same (R. 260-61).

On March 20, 2012, Dr. Wassim Saikali of the Rheumatology and Pulmonary Clinic in Beckley, West Virginia, wrote a letter to Dr. Sibold. Dr. Saikali's impression was that Plaintiff had "abnormal serology, ANA and anti-RNP is positive." He noted that "[a]nti-RNP is usually mixed connective tissue disorder." Plaintiff did not have any sclerodactyly, telangiectasia, or bluish discoloration. His hands remained cold, indicating "possible Raynaud's phenomenon." Dr. Saikali told Plaintiff to stop taking Tramadol and start taking Tylenol with codeine. He intended to begin Plaintiff on Plaquenil if he had "no history of G6PD deficiency and no macular degeneration" even if Plaintiff did not have swelling in his joints, as the Plaquenil could help with joint pain. Dr. Saikali indicated that he would reevaluate Plaintiff in two (2) months or on an as needed basis (R. 262-63.)

Plaintiff returned to see Dr. Sibold on April 16, 2012. He had been experiencing lower back pain. Plaintiff changed his medication; he was taking Lodine and Tylenol. His seizure disorder had been "stable;" he had not experienced any seizures "in a while." Dr. Sibold noted a normal examination and assessed lower back pain and seizure disorder. She continued Plaintiff on his current medications, provided him with prescription refills, and advised him to follow up in four (4) months (R. 264).

Plaintiff returned to see Dr. Saikali on June 18, 2012, for followup for his "osteoarthritis, history of positive ANA and anti-RNP." Plaintiff reported that he was still experiencing "pain and discomfort in the joints in the hands and knees associated with stiffness." He was also tired and fatigued. Tylenol "seem[ed] to help some." Upon examination, Dr. Saikali noted that Plaintiff had "degenerative nodules in the second and third DIP and PIPs." He assessed generalized osteoarthritis and positive ANA with anti-RNP. Dr. Saikali noted no evidence of "clinical lupus or rhematoid." He continued Plaintiff on Lodine and Tylenol and instructed Plaintiff to return in six (6) months. Plaintiff was taking Plaquenil, which could cause seizure; Dr. Saikali indicated that he would check for "possible drug to drug interaction with the seizure medication" (R. 322-23).

On August 13, 2012, Plaintiff returned to see Dr. Sibold. Plaintiff had experienced "dizzy spells." Plaintiff was still taking his Tegretol; he had not had a "spell in quite a while." He was still experiencing "significant joint pain." Plaintiff had just seen a rheumatologist for "positive ANA test and also has severe osteoarthritis." He took Tylenol as needed for pain. Dr. Sibold noted a normal examination and assessed seizure disorder, DJD, positive ANA, epilepsy, and osteoarthritis. She refilled Plaintiff's prescriptions, told him to follow up with the rheumatologist regarding his ANA, and advised him to follow up with her in six (6) months (R. 313).

On August 27, 2012, Dr. Saikali sent a letter to Plaintiff's pharmacist, asking the pharmacist if Plaintiff could be prescribed Plaquenil or if it would interact with the Tegretol Plaintiff took for his seizure disorder. This letter noted that Plaintiff was being treated for mixed connective tissue disorder (R. at 324.)

Plaintiff saw PA Ruth Rhodes, at Dr. Saikali's clinic, on August 28, 2012 for followup for his mixed connective tissue disorder. PA Rhodes noted that Plaquenil had been "contraindicated in seizure disorder." Plaintiff took Lodine and Tylenol as necessary; Lodine helped the stiffness in his hands "somewhat," but he was not sure if Tylenol helped. He also took Flexeril as needed. Plaintiff reported continuing stiffness in the morning for "sometimes up to one hour" and intermittent hand and foot pain. Plaintiff was fatigued. Upon examination of Plaintiff's hands, PA Rhodes noted "degenerative changes over the second and third MCP joints bilaterally and mild swelling of the second MCP joint." Plaintiff also exhibited "[d]egenerative hypertrophy of the knees bilaterally." PA Rhodes assessed mixed connective tissue disorder; prescribed Prednisone, Lodine, and Tylenol; and advised Plaintiff to follow up in three (3) months (R. 325).

On November 26, 2012, Plaintiff returned to see PA Rhodes. Plaintiff had been taking Plaquenil for two (2) weeks; he tolerated it "well." He continued to complain of joint pain and fatigue; he needed "something stronger" than Tylenol and Lodine. PA Rhodes noted a normal examination and assessed mixed connective tissue disorder. She prescribed Plaquenil and Prednisone and advised Plaintiff to return in two (2) months (R. 326).

Administrative Hearing

At the administrative hearing, Plaintiff testified that he could not work because of his seizures, lupus, and rheumatoid arthritis. The medication he took for those conditions "ke[pt] him

out of it." He could "hardly move" his hands and joints. A blood test performed by his rheumatologist showed that he had lupus (R. 29). Plaintiff's arthritis was "everywhere." The pain felt like a "real bad toothache" that was "like stabbing with a knife." Plaintiff's worst pain was in his lower back, left leg, and neck (R. 30).

Plaintiff had trouble concentrating; he forgot "stuff all the time." He stayed "sleepy all the time" because of his medication (R. 30-31). Plaintiff could not sleep; he "might lay down for an hour here, an hour there, even during the night I'm up four, five times during the night with pain." His medications helped "some." The more he moved, the worse the pain was. Plaintiff could "hardly move" in cold, rainy weather. He spent a large portion of the day lying down because it was the "only way [he could] get comfortable" (R. 31). He needed to elevate his legs and put a blanket on them to keep them warm (R. 32).

Plaintiff estimated that he could sit for up to an hour at a time, but that when he would go to get up he would be "so stiff and sore" (R. 32). To relieve his pain, he would lie down. Plaintiff had trouble walking and standing; he could not stand and walk for more than ten (10) minutes because of the pain in his legs and back. He did not lift anything over twenty-five (25) pounds (R. 33). Plaintiff could load the dishwasher and put laundry in the washing machine (R. 33-34). His wife helped him with activities of daily living because he "can't do hardly anything." His wife washed dishes because that chore "kill[ed] his back." Plaintiff had problems with his hands; he could grip "nothing." He had dropped coffee cups and a coffee pot (R. 34). Plaintiff could not reach overhead; he had trouble reaching for objects in front of him. He did not do yard work. Plaintiff could drive "some" but did not "go very far" (R. 35). On a "bad day," Plaintiff spent the day lying on the couch or in bed (R. 37).

The ALJ asked the VE the following hypothetical:

> Let's assume we have a hypothetical person with the same age, education, and work history as Mr. Bennett and let's assume his limitations are that he could lift and or carry 20 pounds on an occasional basis, include frequent lift or carry 10 pounds, could stand or walk, normal breaks for a total of about six hours of an eight-hour workday, assume normal breaks in total for about a six hour or eight-hour workday, he'd never climb ladders, or ropes, or scaffolds, but he may occasionally climb ramps and stairs as well as occasionally balance, stoop, kneel, crouch, walk, those are on an occasional basis. Should avoid constant exposure to extreme cold and vibrations, and avoid all exposure to hazards. And with those types of limitations, are there any jobs that he has done in the past he could still do?

(R. at 38-39.) The VE responded that such an individual could not perform Plaintiff's past work, but could perform the jobs of mail clerk, with 200,000 jobs nationally and 650 regionally; price marker, with 319,000 jobs nationally and 1,050 regionally; and garment sorter, with 178,000 jobs nationally and 500 regionally (R. 39).

The ALJ then asked:

> Then, we have a [sic] assume we have a person same age and education level as Mr. Bennett. Let's presume that he has in the past performed light work. He can lift and or carry 20 pounds on an occasional basis, can lift or carry 10 pounds, he's able to stand or walk or sit each for approximately six hours of an eight-hour workday, with normal breaks, works with a lot of persons who sit or stand alternatively at will, provided that he's not off-task for more than 10 percent of the work period, he can never climb ladders, ropes, or, scaffolds, he can occasionally climb ramps or stairs, can balance, stoop, crouch, or crawl, he must avoid exposure to extreme heat, and excessive vibration, he must avoid all use of moving machinery, exposure to unprotected heights, he is needed to unskilled work if he can keep and can fill the tasks. With those limitations, are there any jobs that a person can do?

(R. at 39-40.) The VE responded that such a person could perform the jobs identified above, but that the numbers would need to be reduced in half "in order to allow for the sit/stand option" (R. 40).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, ALJ Kilbane made the following findings:

13

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2.  The claimant has not engaged in substantial gainful activity since May 28, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.972 *et seq.*).

3.  The claimant has the following severe impairments: seizures and degenerative joint disease (DJD) (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 404.967(b). The claimant is able to occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds. He is able to stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday. He is able to sit (with normal breaks) for a total of about six hours in an eight-hour workday. He could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl. However, he should never climb ladder/rope/scaffolds. He should also avoid concentrated exposure to extreme cold, vibration, and avoid all exposure to hazards (machinery, heights, etc.).

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on October 30, 1965 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the

national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from May 28, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. at 11-20.)

## IV.  Discussion

### A.    Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)).  In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B.    Contentions of the Parties

The Plaintiff contends:

1.      The ALJ erred in his application of Acquiescence Ruling ("AR") 00-1(4); and

2.      The ALJ erred in assessing his credibility.

(Plaintiff's Brief at 7-13.)

The Commissioner contends:

1.      The ALJ properly evaluated the credibility of Plaintiff's subjective complaints; and

2.      The ALJ properly evaluated the prior administrative decision pursuant to Acquiescence Ruling 00-1(4).

(Defendant's Brief at 6-13.)

In his reply, Plaintiff reiterates the arguments made in his initial brief. (Plaintiff's Reply at 1-4.)

## C.      AR 00-1(4)

Plaintiff first claims that the ALJ erred in applying AR 00-1(4) "in considering and weighing the prior ALJ's decision," and that such error was "reversible error." (Plaintiff's Brief at 10.) Specifically, Plaintiff alleges that the ALJ "did not consider the prior ALJ's decision at steps two and three of his review as required by the ruling." (Id. at 8.) He also notes that "the current ALJ's decision was made only about nineteen months after the prior ALJ's decision was made." (Id.) Plaintiff asserts that such error was not harmless "as the outcome of this case would probably have been different had the ALJ found the severe impairments the prior ALJ had found and had included all of the prior ALJ's restrictions in his RFC." (Id. at 10.)

In the Fourth Circuit,

where a final decision of SSA after a hearing on a prior disability claim contains a finding required at a step in the sequential evaluation process for determining disability, SSA must consider such finding as evidence and give it appropriate weight in light of all relevant facts and circumstances when adjudicating a subsequent

16

disability claim involving an unadjudicated period.

AR 00-1(4), 2000 WL 43774, at *4 (Jan. 12, 2000). The Fourth Circuit has noted that *res judicata* applies to Social Security disability cases, and that *res judicata* "prevents reappraisal of both the Secretary's findings and his decision in Social Security cases that have become final." Lively v. Sec. of Health & Human Servs., 820 F.2d 1391, 1392 (4th Cir. 1987). Subsequently, the Fourth Circuit clarified its decision in Lively by explaining:

> Rather than signaling a sea change in the law of preclusion, the result in Lively is instead best understood as a practical illustration of the substantial evidence rule. In other words, we determined that the finding of a qualified and disinterested tribunal that Lively was capable of performing only light work as of a certain date was such an important and probative fact as to render the subsequent finding to the contrary unsupported by substantial evidence. To have held otherwise would have thwarted the legitimate expectations of claimants–and, indeed, society at large–that final agency adjudications should carry considerable weight.

Albright v. Comm'r of Soc. Sec. Admin., 174 F.3d 473, 477-78 (4th Cir. 1999). Therefore, while an ALJ must consider prior administrative findings, he or she is not bound to adopt those findings verbatim but must consider and assign weight to such findings. Id. Moreover, the Lively Court explained that "[p]rinciples of finality and fundamental fairness drawn from § 405(h), as discussed above, indicate that the Secretary must shoulder the burden of demonstrating that the claimant's condition had improved sufficiently to indicate that the claimant was capable of performing [a certain level of] work." Lively, 820 F.2d at 1392 (alteration in original).

Subsequently, the Administration issued AR 00-1(4), in which it promulgated the procedure an adjudicator must follow when there has been a final decision by an ALJ or the Appeals Council in a prior disability claim. That procedure is as follows:

> When adjudicating a subsequent disability claim arising under the same or a different title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding

as evidence and give it appropriate weight in light of all relevant facts and circumstances. In determining the weight to be given such a prior finding, an adjudicator will consider such factors as: (1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim.

Where the prior finding was about a fact which is subject to change with the passage of time, such as a claimant's residual functional capacity, or that a claimant does or does not have an impairment(s) which is severe, the likelihood that such fact has changed generally increases as the interval of time between the previously adjudicated period and the period being adjudicated increases. An adjudicator should give greater weight to such a prior finding when the previously adjudicated period is close in time to the period being adjudicated in the subsequent claim, e.g., a few weeks as in Lively. An adjudicator generally should give less weight to such a prior finding as the proximity of the period previously adjudicated to the period being adjudicated in the subsequent claim becomes more remote, e.g., where the relevant time period exceeds three years as in Albright. In determining the weight to be given such a prior finding, an adjudicator must consider all relevant facts and circumstances on a case-by-case basis.

AR 00-1(4), 2000 WL 43774, at *4.

As to ALJ Baumerich's prior decision, the ALJ wrote at Step Four:

Social Security Acquiescence Ruling (AR) 00-1(4), *Albright v. Commissioner of the Social Security Administration*, 174 F.3d 473 (4th Cir. 1999) (interpreting *Lively v. Secretary of Health and Human Services*, 820 F.2d 1391 (4th Cir. 1987)) is applicable in this case in view of the final Administrative Law Judge (ALJ) decision made on the claimant's prior application(s). The Social Security Administration (SSA) interprets the decision by the Court of Appeals in *Albright* to hold that where a final decision by an ALJ or the Appeals Council after a hearing on a prior disability claim contains a finding required at a step in the sequential evaluation process for determining disability, SSA must consider such finding as evidence and give it appropriate weight in light of all relevant facts and circumstances when adjudicating a subsequent disability claim involving an unadjudicated period. In determining the appropriate weight to give a prior finding, an adjudicator should consider factors such as: (1) whether the fact on which the prior finding was based in subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time

that has elapsed between the period previously adjudicated and the period under consideration in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim.

In determining the residual functional capacity stated above, the undersigned has considered the prior decision of ALJ Baumerich dated May 27, 2011 (Ex. B1A). Judge Baumerich determined that the claimant could do light work except he could stand, walk, and sit, each, for approximately six hours in an eight-hour workday, with normal breaks. Work must allow the claimant to sit or stand, alternatively, at will, provided he is not off task, more than ten percent of the work period. He could never climb ladders, ropes, or scaffolds. He could occasionally climb ramps, or stairs, balance, stoop, crouch, kneel, and crawl. He must avoid all use of moving machinery and exposure to unprotected heights. He is limited to unskilled work, with routine and repetitive tasks. The undersigned has afforded little weight to this opinion because Judge Baumerich did not have access to the latest medical evidence, which shows that the claimant is not as limited as he determined.

(R. at 17.)

The undersigned agrees with Plaintiff that the ALJ did not consider ALJ Baumerich's prior decision at Steps Two and Three of the sequential evaluation. The only time that the ALJ mentioned ALJ Baumerich's prior decision was at Step Four, when he assigned little weight to her residual functional capacity ("RFC") determination. However, AR 00-1(4) describes whether a claimant "does or does not have an impairment(s) which is severe" as a fact from a prior decision that must be considered and assigned weight. At Step Two, ALJ Baumerich had previously found that Plaintiff's severe impairments included bilateral knee degenerative arthritis, a history of left lateral tibial plateau fracture, lumbar spine arthritis, intermittent dizzy spells of unknown etiology, and a history of seizure disorder. (R. at 49.)

ALJ Kilbane, however, found that Plaintiff's severe impairments only included seizures and degenerative joint disease. (R. at 13.) At no time did he state what weight, if any, he accorded ALJ Baumerich's prior Step Two determination. At no time did ALJ Kilbane discuss whether Plaintiff's

bilateral knee degenerative arthritis, history of left lateral tibial plateau fracture, lumbar spine arthritis, and intermittent dizzy spells "were subject to change with the passage of time, the likelihood of such a change or the extent that evidence not considered in the final decision on the prior claim provided a basis for making a different finding." Bowman v. Astrue, No. 1:09CV137, 2011 WL 744767, at *15 (N.D. W. Va. Jan. 27, 2011), adopted by 2011 WL 736806 (N.D. W. Va. Feb. 23, 2011). This Court has previously found that an ALJ's failure to consider a prior ALJ's decision at Step Two "alone requires remand pursuant to Fourth Circuit law and Acquiescence Ruling 00-1(4)." Id., 2011 WL 744767, at *16.

The Commissioner argues that remand to consider the prior RFC determined by ALJ Baumerich would be futile because, "if the restrictions from the prior administrative decision's RFC were included in the current RFC . . ., the record makes clear that it is possible to know that a significant number of jobs would still exist if those limitations were included in the current RFC." (Defendant's Brief at 11-13.) However, the Commissioner's argument ignores the fact that ALJ Kilbane failed to consider ALJ Baumerich's prior decision at Steps Two and Three of the sequential evaluation, and the undersigned will not speculate as to how his decision may have differed had he properly followed the requirements of AR 00-1(4). Accordingly, to remain consistent with this Court's previous decision in Bowman, the undersigned recommends that Plaintiff's case be remanded to the Commissioner for proper consideration of ALJ Baumerich's prior decision pursuant to AR 00-1(4).

**D.      Credibility**

As his second claim for relief, Plaintiff asserts that the ALJ erred in assessing his credibility. Specifically, Plaintiff argues that the ALJ "did not address any of the factors he was required to

address pursuant to SSR 96-7p, and §§ 404.1529 and 416.929." (Plaintiff's Brief at 12.) He also states that there "is nothing in the ALJ's decision to indicate that he gave consideration to [Plaintiff's] testimony when making his credibility determination." (Id. at 12-13.) The undersigned has already found that the ALJ erred in his application of AR 00-1(4) when considering the prior determination made by ALJ Baumerich regarding Plaintiff's previous applications. Accordingly, the undersigned declines to consider Plaintiff's argument regarding the ALJ's credibility determination.

## V. CONCLUSION

Upon consideration of all the above, the undersigned United States Magistrate Judge finds and concludes that substantial evidence does not support the ALJ's determination that Plaintiff was not disabled during the relevant time period, and recommends that the case be reversed and remanded for the Commissioner for proper consideration of ALJ Baumerich's prior administrative decision pursuant to Acquiescence Ruling 00-1(4).

## VI. RECOMMENDATION

For the reasons herein stated, I find the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI is not supported by substantial evidence. I accordingly recommend Defendant's Motion for Summary Judgment be **DENIED**, and the Plaintiff's Motion for Summary Judgment be **GRANTED** and this action be **REMANDED** to the Commissioner for further action in accordance with this Report and Recommendation.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy

of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _22_ day of _January_ , 2015.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE